**Edmund A. PRENTIS, Lazarus White, Charles B. Spencer, Inc. and Spencer, White & Prentis. Inc., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. Civil 133–258.**

United States District Court
S. D. New York.
July 10, 1967.

**464**

Spencer & Tunstead, New York City, for plaintiffs, Richard H. Tunstead, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Irwin B. Robins, Grant B. Hering, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

### AFTER REMAND FROM COURT OF APPEALS [1]

LEVET, District Judge.

My original Opinion, Findings of Fact and Conclusions of Law were dated and filed April 16, 1964. That opinion is published in 13 A.F.T.R.2d 1439 and 273 F.Supp. 449. By decision of the United States Court of Appeals, Second Circuit, handed down July 26, 1966, 364 F.2d 525, the case was remanded for further proceedings as hereinafter set forth.

The net effect of the decision of the Court of Appeals was to affirm the District Court's decision as to the River Construction Corporation and to remand for further testimony, findings of fact, and conclusions of law, issues with respect to the tax transactions of the two corporate plaintiffs in relation to a "reorganization" involved in the above-entitled suit. (See Findings 25–37 and Conclusions of Law 4–7 in the previous District Court opinion)

Pursuant to the suggestion of the Court of Appeals (p. 538), the government interposed no objection, and this court thereupon granted plaintiffs leave to amend their complaint and, likewise, allowed defendant to amend its answer. These amendments were as follows:

(a) The second cause of action of the complaint was amended by adding to Paragraph 25 the following sentence:

"The deficiency and interest were further unlawfully imposed upon said plaintiff for the reason that if its sale of plant and equipment to Plaintiff Spencer, White & Prentis, Inc. is determined to be a nontaxable transaction, then all taxes and interest paid on such transaction should be credited or refunded to said taxpayer."

(b) The answer to the second cause of action was amended to read as follows:

"Denies the allegation of Paragraph 25 of the complaint, as amended, and further alleges that this Court is without jurisdiction to grant the relief sought in Paragraph 25 of the complaint, as amended, in that the claim for credit or refund sought, is barred by the statute of limitations."

(See Pretrial Order filed March 3, 1967, p. 1)

Pursuant to the opinion of the Court of Appeals, 364 F.2d 525, and with the consent of the parties, the issues were defined by pretrial order as follows:

(a) When was the plan of reorganization finally consummated?

(b) What assets (other than those as to which the parties have stipulated) were transferred to New Spencer as part of the plan of reorganization? *Specifically,* were stock in Drilled-In-Caisson Corp. and goodwill as identified by the defendant, or the corporate name, as identified by the plaintiffs, transferred by Old Spencer to New Spencer as part of the plan of reorganization?

---

1. This supersedes the former opinion, etc. except as to the District Court's determination of the River Construction Corporation matter, which was affirmed by the Court of Appeals, 364 F.2d 525 (2nd Cir. 1966).

(c) Were the assets transferred by Old Spencer to New Spencer solely in exchange for stock and securities? *Specifically*, did any of the consideration received by Old Spencer as part of the reorganization constitute "other property" within the meaning of the Internal Revenue Code?

(d) In the event that any or all of the consideration transferred by New Spencer to Old Spencer constituted "other property," have plaintiffs proved that Old Spencer recognized gain on the transfer? *Specifically*, did the value of all the consideration received by Old Spencer from New Spencer exceed the adjusted cost basis of the property transferred by it to New Spencer as part of the reorganization?

(e) In the event that the Court finds that Old Spencer received "other property" as part of the reorganization, and that Old Spencer was entitled to recognize gain (to the extent of the value of the "other property"), how shall the amount equal to that gain be apportioned for the purpose of determining their basis, among the assets other than cash and the equivalent of cash which were received by New Spencer as part of the reorganization?

(f) In the event that the court finds that New Spencer is entitled to less than all of the step-up in basis on the transferred assets which it claimed for purposes of depreciation on its tax return for the year ended June 30, 1953, then may Old Spencer recover any part of the tax paid by or charged to it which was attributable to gain which was reported by Old Spencer in respect of the sale of those assets on its tax return for the year ended June 30, 1952?

(See Pretrial Order, March 3, 1967, item 8, pp. 7, 8, 9)

After hearing the evidence submitted by the parties, examining the exhibits, the pleadings, the briefs and Proposed Findings of Fact and Conclusions of Law submitted by counsel, and after oral argument, this court makes the following Findings of Fact [1] and Conclusions of Law [2] with respect to the issues concerned in this remand.[3]

## FINDINGS OF FACT

### I.

**A. WERE THE TRANSACTIONS OF JUNE 1952 PROPERLY VIEWED AS STEPS IN A UNIFIED PLAN? WHEN WAS THE PLAN OF REORGANIZATION CONSUMMATED?**

1. (25) In 1919, Edmund A. Prentis, Lazarus White and Charles B. Spencer organized Spencer, White & Prentis, Inc. to engage in construction work and civil engineering with emphasis on foundation and underpinning projects. The business was successful and by 1952 the founders were getting along in years and decided to allow younger associates to acquire their construction business.[4] (15, 16, 76–77, 108–11) The younger group was to have a smaller stake to lose in the risky construction business than the Old Company, but they, in the New Company, were to have the benefit of the name, Spencer, White & Prentis, which had become well known. (77)

2. (26) In June 1952, the old corporation determined to reorganize. (77) It changed its name to Edmund A. Prentis, Lazarus White and Charles B. Spencer, Inc. ("Old Spencer") and simultaneously formed a new corporation called

---

1. The number appearing in parentheses at the head of each finding indicates the number of such finding (or its equivalent) in my original findings of April 16, 1964, not officially reported. Other findings herein not so indicated are new findings.

2. All Code sections referred to at any point are sections of the Internal Revenue Code of 1939.

3. All testimony and exhibits introduced into evidence at the initial trial are considered to be in evidence on this remand.

4. Numbers so set forth refer to pages of the transcript. The pages of the testimony taken on the remand are consecutive to those of the original trial minutes.

Spencer, White & Prentis, Inc. ("New Spencer"), organized under the laws of New York to engage in construction work.

3. (2) In June 1952 Old Spencer changed its name to Edmund A. Prentis, Lazarus White, Charles B. Spencer, Inc. Thereafter a certificate of incorporation was filed with the Secretary of State of New York forming a new corporation named Spencer, White & Prentis, Inc. ("New Spencer"). (Ex. 1, p. 15)

4. (33) Prior to June 1952, Old Spencer had a staff of about 30 employees in the office and a staff in the field whose number would depend upon the number of contracts in progress. When New Spencer was formed it took over the entire office and field staff of Old Spen-cer. Since 1952 Old Spencer has not performed any construction or engineering business and has not retained any employees. All it has is investments. (257–58, 261) [5]

5. (35) The key officers of New Spencer were substantially the same persons as the officers of Old Spencer immediately after New Spencer took over the business and for several years thereafter. (149, 203, 255) The present President, Vice President and Secretary-Treasurer of New Spencer are the sons of founders of Old Spencer. (253)

6. (27) New Spencer was organized with the following authorized capital structure:

| | |
|---|---|
| Class A common stock—300 shares par value $100.00 | $ 30,000.00 |
| Class B common stock—700 shares par value at $100.00 | 70,000.00 |
| 4% cumulative participating (to the extent of 15% of net profits after income taxes) preferred stock—100,000 shares par value $10.00 | 1,000,000.00 |
| Total authorized capital | $1,100,000.00 |

(See Ex. 37, pp. 5, 6)

7. On June 16, 1952, the Board of Directors of Old Spencer voted to purchase $160,200 par value of $10.00 preferred stock and $30,000 par value of Class A common stock of New Spencer for

| | |
|---|---|
| Cash ...................$175,002.18 | |
| Furniture and Fixtures .... 5,800.00 | |
| Prepaid Insurance Premiums ............. 9,397.82 | |
| | $190,200.00 |

(Ex. 31, Directors Minutes, p. 4)

8. (28) Subsequent to the organization of New Spencer, on June 18, 1952 Old Spencer transferred to New Spencer $5,800 in furniture and fixtures, $9,397.-82 in prepaid insurance premiums and $175,002.18 in cash. Old Spencer, in fact, also transferred its name, goodwill and prestige (112, 246–47) in addition to the jobs in progress (Pretrial Order 3(b)). In return for these transfers totalling $190,200, exclusive of goodwill and jobs in progress, Old Spencer received 16,020 shares of preferred stock and 300 shares of Class A common stock of New Spencer (Ex. 31). New Spencer is entitled, upon notice, to redeem the preferred stock at par and the preferred stockholders are entitled to priority upon liquidation (see Certificate of Incorporation, Ex. AT). "Each share of preferred stock and Class A common stock and Class B common

5. E. Prentis testified that Old Spencer, although practically its whole staff are licensed engineers, did no engineering or engineering consultation work and that all it had was investments. (261)

stock shall have one vote in all elections and in all proceedings which authorizes any action by the vote or written consent of stockholders of this corporation." (Certificate of Incorporation, Ex. AT')

9. On June 25, 1952, the Board of Directors of Old Spencer voted to "sell" to New Spencer its plant and equipment for $381,112.83, to be paid as follows:

Cash ................... $ 50,000.00
Promissory note and conditional bill of sale due in
six months ........... $331,112.83
$381,112.83

(Ex. 31, Directors Minutes, p. 6)

10. (29) On June 26, 1952, as part of the transfer of its assets, Old Spencer transferred to New Spencer its construction equipment and machinery and took back in exchange $50,000 cash and a six-months note for $331,112.83 due December 26, 1952, bearing interest at the rate of 3% per annum (Ex. 31). The machinery and equipment was largely special equipment which was essential to the plaintiff's construction business (241, 242).

11. (30) In connection with the transfer of equipment and machinery, a conditional sales contract was entered into between the parties under the terms of which Old Spencer was entitled to repossess the equipment and machinery and retain the sum of $50,000 as liquidated damages upon default by New Spencer in payment of the note in the amount of $331,112.83 payable on December 26, 1952 with interest at the rate of 3% per annum.

12. (37) Although certain formalities were observed, the transfer of the machinery and equipment on June 26, 1952 was not an arm's length sale. The transfer of the machinery and equipment was a step in a plan of reorganization, the primary purpose of which was to attempt to acquire (for New Spencer) a stepped-up basis of the depreciable assets equal to their market value at the time of the transfer.

12A. The basic plan of reorganization designed by the parties projected the transfer of Old Spencer's construction business with all assets essential to its operation to New Spencer. The plan also included,

(1) Ownership of 30% of the common stock of New Spencer by Old Spencer;

(2) Ownership by 10 employees of 70% of the common stock (93, 245);

(3) Receipt by Old Spencer of preferred stock;

(4) 80% or more control of New Spencer by Old Spencer;

(5) Acquisition by New Spencer of the benefit of the name, "Spencer, White & Prentis." (511)

13. In addition to continuing jobs of Old Spencer in progress,[6] New Spencer executed construction contracts which had been initiated by Old Spencer, with no indication that the owners were told that the "Spencer, White & Prentis, Inc." which executed the contract was not the same corporation which made the proposal (Ex. BC, 585–86; Ex. BE–BF, 592–95). Similarly, New Spencer performed contracts which had been entered into by Old Spencer (although performance had not commenced) with no indication that the owner was told that the corporation performing the contract was different from the one which entered into the contract [7] (Ex. BG, 596–97).

14. As of January 7, 1953, Old Spencer owned 51,020 shares of preferred stock in New Spencer and 300 shares of Class A common stock (which was 100% of the issued stock of that date). Thus, Old Spencer clearly controlled New Spencer within the meaning of the statutes in January 1953 (Ex. 26).

**6.** Plaintiffs stipulated that jobs-in-progress were transferred (Pretrial Order, March 3, 1967, p. 2).

**7.** One of the plaintiffs' witnesses, who had dealt with Old Spencer as early as 1950, was unaware of the fact that the corporation with whom he dealt in 1953 (New Spencer) was different from Old Spencer (484).

During the period from January 8, 1953 through December 31, 1953, New Spencer issued only 650 shares of Class B common stock to individuals, which comprised only 1.2% of New Spencer's issued stock (see Ex. C), so that control under the statute remained in Old Spencer during 1953 since Old Spencer retained at least 98.8% of New Spencer's stock.

The parties also stipulated that Old Spencer was in control of New Spencer until the plan of reorganization was consummated (Pretrial Order of March 3, 1967, p. 2). Thus, the criteria of Section 112(g) (1) (D) were fulfilled. (See Finding 39)

■ 15. I find that the transactions set forth in Part I, Findings 1–14, and in Part IV, Findings 28–42, are properly viewed as steps in a unified plan, designed and effectuated as therein particularized.

I find that the plan of reorganization was consummated by January 8, 1953 (see Part IV).

As subsequently enunciated, however, the sale of the Drilled-In-Caisson stock by Old Spencer to New Spencer was not a part of the plan of reorganization (see Part II).

## II.

**B (1) WAS THE STOCK OF DRILLED-IN-CAISSON CORP. TRANSFERRED BY OLD SPENCER TO NEW SPENCER AS PART OF THE PLAN OF REORGANIZATION?**

16. · Drilled-In-Caisson Corp. ("Caisson") was a corporation engaged in installation of caissons in heavy, large-diameter casings driven into rock, the rock being then excavated and steel core put in (485, 486). In June 1952, 50% of its outstanding shares (650 shares) was owned by Old Spencer and 50% by Western Foundation Company (362). Old Spencer and Western Foundation Company each had representatives on the Board of Directors of Caisson (462). Old Spencer had engaged in joint ventures with Caisson, as had Western Foundation Company (362).

17. On June 25, 1952, the Board of Directors of Old Spencer, by resolution, sold to New Spencer 250 shares of stock of Caisson for $101,750 upon terms expressed in an agreement thereafter set forth, said stock to be deposited in escrow subject to payment of $25,000 and a promissory note for $76,750 (Ex. 31, Directors Minutes, p. 6). Aside from the fact that this resolution was passed on June 25, 1952, it is connected in no way with any resolutions relative to transfer by Old Spencer to New Spencer.

18. The agreement between Old Spencer and New Spencer in respect to the sale of Caisson was executed separately from any part of the plan of reorganization. It contained an escrow provision with respect to this stock (Ex. 40).

19. On June 26, 1952, New Spencer paid Old Spencer the $25,000 and executed and delivered to Old Spencer the $76,750 note and the escrow agreement (Exs. 40, 43). Old Spencer retained 400 shares of Caisson stock as an investment. The adjusted cost basis of Old Spencer for the Caisson stock sold to New Spencer was $25,000 and the book value of said shares at the time of the sale was $376.24 per share, or an aggregate of $94,060 for the 250 shares sold to New Spencer (367–68). Thus, New Spencer paid Old Spencer $7,750 more than its book value for the Caisson stock. No testimony appears as to the value of the stock at the time of sale.

20. On September 8, 1952, $10,000 was prepaid by New Spencer to Old Spencer in reduction of the said note of $76,750 in respect to the Caisson stock (Ex. 45; 379). On December 27, 1952, said note was renewed for 90 days to March 27, 1953, and on March 27, 1953 for another 90 days to June 30, 1953 (Ex. 43). On June 30, 1953, said note was further reduced by $10,000 (379); on June 30, 1953, renewed for 90 days to September 30, 1953 (Ex. 43), and on June 25, 1954 the balance of $56,750 was paid in full (379). Interest was paid on said note of $76,750 as follows: January 31,

1953, January 29, 1954, March 25, 1954, June 25, 1954 (Ex. 46; 383).

21. After the purchase of the Caisson stock, one of New Spencer's directors was on Caisson's Board; New Spencer engaged informally in joint venture work with Caisson, as Old Spencer had done before; and did extensive work of this type (412, 493–94). Caisson was dissolved about 1956–1957 (414) and New Spencer engaged in installation of drilled-in-caissons thereafter (415–23). New Spencer apparently believed that caisson work was an asset which would be an important line of work for New Spencer since Caisson's patents were running out (491–92).

22. However, in 1952, there was no legal objection preventing Caisson from entering into any joint venture agreements with any corporation or individual that it chose (463, 508–09). There was no practical impediment to New Spencer engaging in joint ventures with Caisson even if New Spencer had not purchased stock. Moreover, Old Spencer (a 50% stockholder), which also owned virtually all of New Spencer, had ample influence to induce Caisson to give business, which formerly had gone to Old Spencer, to New Spencer. Old Spencer would have participated in the profits through its ownership of Caisson and its ownership of New Spencer.

23. In my original opinion I held that the sale by Old Spencer to New Spencer of the 250 shares of the common stock of Caisson was a part of the transfer of assets to the newly-organized corporation (i. e., a part of the reorganization) (Finding 29). Nevertheless, on reconsideration and hearing additional proof, I believe that this was error, and I now find that the Caisson stock was not an operating asset and was not transferred as a part of or pursuant to the plan of reorganization. The plaintiffs have failed to prove by a fair preponderance of the evidence that this stock was an inherent part of the plan of reorganization.

III.

B (2) WAS THE GOODWILL OR CORPORATE NAME OF OLD SPENCER TRANSFERRED BY OLD SPENCER TO NEW SPENCER AS PART OF THE PLAN OF REORGANIZATION?

24. Until 1952, the corporate name of Old Spencer was Spencer, White & Prentis, Inc. (see Finding 1). In 1952, the corporate name was changed to Edmund A. Prentis, Lazarus White and Charles B. Spencer, Inc. (Finding 2). The new company was given the name Spencer, White & Prentis, Inc. (Finding 2). Thus, the new company received the benefit of the well-known name formerly held by the old company and was to engage in the business of construction for which the old company had a well-known reputation.

25. The name, "Spencer, White & Prentis," (the present name of New Spencer) carries weight in the construction industry (112). Before 1952, the old name, "Spencer, White & Prentis," was said to be the "Tiffany's" of its particular industry (553–54). The name, "Spencer, White & Prentis," had value to New Spencer (511). It had market value whether or not the personnel formerly associated with Old Spencer went to work for New Spencer, to whom the name was, in fact, transferred (481–82).

26. Although the plaintiffs contend that Old Spencer abandoned and did not sell, transfer or assign its original name to New Spencer, this is a specious contention. Plaintiffs' witnesses, as heretofore stated, conceded that the name, "Spencer, White & Prentis," had value, and, particularly, value to New Spencer. It is exceedingly doubtful if New Spencer would have had the right to use that name without either the consent, either express or implied, of Old Spencer. It was a willing, intentional and beneficial "abandonment." The facts, including the entire transaction, including the actions revealed by stockholders' and directors' minutes, plainly demonstrate the consent of Old Spencer to this use.

27. I find, therefore, that the corporate name and goodwill of Old Spencer in the construction business was transferred by Old Spencer to New Spencer as a part of the plan of reorganization.[7A]

## IV.

C WERE THE ASSETS TRANSFERRED BY OLD SPENCER TO NEW SPENCER SOLELY IN EXCHANGE FOR STOCK AND SECURITIES?

*SPECIFICALLY,* DID ANY OF THE CONSIDERATION RECEIVED BY OLD SPENCER AS PART OF THE REORGANIZATION CONSTITUTE "OTHER PROPERTY" WITHIN THE MEANING OF THE INTERNAL REVENUE CODE?

D DID THE VALUE OF ALL THE CONSIDERATION RECEIVED BY OLD SPENCER FROM NEW SPENCER EXCEED THE ADJUSTED COST BASIS OF THE PROPERTY TRANSFERRED BY OLD SPENCER TO NEW SPENCER AS A PART OF THE REORGANIZATION?

HAVE THE PLAINTIFFS PROVED THAT OLD SPENCER REALIZED GAIN ON THE TRANSACTION?

SINCE C AND D ABOVE OVERLAP, AND FOR REASONS OF BREVITY, I TREAT THESE QUESTIONS TOGETHER.

28. (32) In order to assign values to the assets being sold by Old Spencer to New Spencer, a committtee was appointed to evaluate each piece of machinery and equipment (80–83, 209). The committee, composed of the younger employees of Old Spencer, delegated William Hughes and Harry Cowley, also employees of Old Spencer, the actual task of evaluating each piece of equipment. The committee then reviewed the prices suggested by Messrs. Hughes and Cowley and determined that they were fair and reasonable. The valuation standards applied were that of a single sale of an entire inventory and they assessed a value of $381,112.81, which was modified slightly by the committee. These values, it was agreed, were fair and reasonable. (Pretrial Order of March 3, 1967, p. 3)

29. On June 26, 1952, New Spencer delivered to Old Spencer its note for $331,112.83, for purportedly machinery, equipment, etc., payable six months after date at 10 East 40 Street, New York, New York, with interest at 3% (Ex. 36).

30. Old Spencer also transferred to New Spencer eight contracts which were in a partial state of completion as of June 1952 (Ex. AS).[8] Prior to November 1, 1952, New Spencer realized a net loss from all contracts on which it operated (after provision for estimated overhead) of $46,063.52 (Ex. AY). New Spencer's cumulative net loss from contracts it had operated from June 1952 to November 30, 1952 and December 31, 1952 (after provision for overhead) was $35,291.69 and $96,774.86, respectively (Ex. AY).

31. Payment of said note for $331,-112.81 (the machinery note) was not made on December 26, 1952, as required by the conditional sales agreement. There is nothing to show any agreement to extend the time of payment (31).[8A] Moreover, certain large items of machinery covered by the conditional sales agree-

---

**7A.** Plaintiffs have failed to prove the basis of the name, goodwill and jobs-in-progress transferred by Old Spencer to New Spencer.

**8.** With respect to the jobs-in-progress which were transferred by Old Spencer to New Spencer as part of the plan of reorganization, there was no formal document of assignment (185, 580) nor was there any formal agreement concerning the allocation of profits on the jobs between Old Spencer and New Spencer (581).

**8A.** It is my opinion that the parties did not contemplate payment of the note on the due date and did contemplate issuance or preferred stock as effected (see Finding 33) and issuance of Class B Common stock (see Finding 34).

ment were sold by New Spencer (Ex. AS) and this is no proof that Old Spencer consented thereto (451) or received the proceeds (563).

32. The aforesaid note for $331,112.-83 was not paid until January 7, 1953 by check of even date in the said amount (Ex. 37) and interest on said note was paid on January 31, 1953 in the sum of $5,408.17 (Ex. 46).

33. On December 23, 1953, the Directors of New Spencer passed the following resolution:

> "RESOLVED that to relieve the acute shortage of available capital funds of this corporation, it sell Three Hundred and Fifty Thousand ($350,-000) par value of preferred stock of this Corporation at par to Edmund A. Prentis, Lazarus White, Charles B. Spencer Inc." (Ex. 82)

On January 6, 1953, Old Spencer borrowed $300,000 from Sunswick Corporation (Ex. AU; 538), a personal holding company owned and controlled by the families of the founders of Old Spencer (397). On January 7, 1953, Old Spencer paid $350,000 in cash for 35,000 shares of preferred stock in New Spencer (Ex. AQ; 539–40). New Spencer paid the note for $331,112.83, and on January 8, 1953, Old Spencer repaid the $300,000 loan to Sunswick Corporation (Ex. AU; 540).

34. As a part of the plan of reorganization, and in consummation thereof, the following further step was taken by New Spencer: On December 23, 1952, the Board of Directors of New Spencer voted to issue 620 shares of Class B common stock to ten employees (Ex. 82). This stock was issued on January 8, 1953 (Ex. 26A).[9]

35. (12) On December 23, 1952, at a special meeting of the Board of Directors of New Spencer it was resolved that, to relieve the acute shortage of available capital funds of the corporation, it

sell 35,000 shares ($350,000 par value) of corporate preferred stock to Old Spencer and 620 shares ($62,000) of Class B common stock in varying numbers of shares to ten younger members of the staff, making in all a sale of $412,000 worth of stock (Ex. 82).

36. New Spencer, between August 1, 1952 and December 14, 1956, borrowed at *various times* substantial amounts for working capital from Sunswick Corporation (an allied family corporation), from Old Spencer, or from Spencer, White & Prentis of Connecticut and from Royer-Marshall Co. Inc., all on notes (Exs. 50–79 inclusive). New Spencer in the same period also secured additional capital, (a) $350,000 from Old Spencer on the sale of preferred stock (Ex. 82), and (b) $62,-000 from the sale of Class B common stock to ten of the younger staff members.

37. (15) All of the notes given by New Spencer to Old Spencer and the other lenders were paid in full and interest thereon was paid by New Spencer (Ex. 37, 379, 411; Ex. 45).

38. The surrounding facts and circumstances indicate that the purpose of the equipment note was to ultimately transform it into preferred stock. Therefore, it was a "security." The cash flowing to New Spencer from Old Spencer was for operational purposes. These purposes are shown by the following facts:

(1) The average net profit realized by Old Spencer from construction contracts and related activities (after estimated state and federal taxes) for the fiscal years 1948 through 1951 was $157,608.-86 (see Ex. AX).

(2) The average working capital of Old Spencer for the fiscal years June 30, 1948 through 1952 was $824,243.58.

(3) Neither Old Spencer nor New Spencer expected that New Spencer would earn $300,000 during the period July 1 to

---

**9.** Of the remaining shares of authorized Class A stock, none was issued until more than eleven months later (Ex. 26D) and the decision to issue such stock to three employees was made in each case on the date of issue (571–72).

December 31, 1952 (Cowley, office manager of Old Spencer and New Spencer, who was in charge of financial affairs of both corporations, 433, 547).

(4) The net deficit in maximum working capital of New Spencer was as follows:

As of November 30, 1952 ........$184,256.58

As of December 31, 1952 ........$127,623.65.
(Ex. AW)

(5) New Spencer's cumulative net loss from all contracts in 1952 was as follows:

As of November 1, 1952 ..........$ 46,063.52
(Ex. AX)

As of November 30, 1952 ........$ 35,291.69
(Ex. AX)

As of December 31, 1952 ..........$ 96,774.86
(Ex. AY)

———◆———

(6) New Spencer concededly had inadequate capital (432). The Board of Directors stated that it had an "acute shortage of available capital funds" (Ex. 82). The note was a camouflage for the ultimate issuance of preferred stock.

39. (34) At all times prior to January 8, 1953, Old Spencer owned 100% of the issued and outstanding stock of New Spencer (216; Ex. 32). During the year 1953, New Spencer issued 650 shares of Class B common stock to officers and key employees of New Spencer (Ex. 32). At the end of the taxable year 1953, Old Spencer still owned 98.8% of the stock of New Spencer (Ex. C, schedule on changes in stock holdings during the year included in tax return. See also Finding 14).

40. The fair market value in the hands of Old Spencer on the date of transfer of the machinery and equipment, furniture and fixtures, prepaid insurance premiums, were as follows:

| ASSETS | FAIR MARKET VALUE |
|---|---|
| Machinery & Equipment | $381,112.83 |
| Furniture & Fixtures | 5,800.00 |
| Prepaid Insurance Premiums | 9,397.28 |
| TOTAL | $396,310.11 |

———◆———

(See Pretrial Order, March 3, 1967, p. 3)

41. The furniture and fixtures and the prepaid insurance premiums were paid for on or about June 18, 1952 by the issuance of stock (see Findings 7, 8). For the machinery and equipment, valued at $381,112.83, Old Spencer received $50,-000 cash on June 26, 1952 and the note for $331,112.83 (Findings 9, 10). Later, and on January 7, 1953, New Spencer received $350,000 and Old Spencer received $350,000 in preferred stock. The aim of the parties had been achieved. The note was eliminated and the preferred stock, its ultimate form, as designed from the beginning, was issued.

42. The net effect stated in terms of the Court of Appeals classification (p. 533) was as follows:

Old Spencer received:

| | |
|---|---:|
| 16,020 shares preferred stock | $160,200.00 |
| 300 shares Class A common stock | 30,000.00 |
| Note | 331,112.83 |
| **TOTAL** | $521,312.83 |

New Spencer received:

| | |
|---|---:|
| Furniture, fixtures and prepaid insurance premiums | $15,197.82 |
| Plant and equipment | 381,112.83 |
| Cash (Net) | 125,002.18 |
| **TOTAL** | $521,312.83 |

———◆———

In addition, as heretofore shown, New Spencer received the use of the name of the old corporation, its goodwill in the construction field, and the value, if any, of uncompleted contracts (see Findings 13, 24–27, 30).

43. Upon the basis of the foregoing findings, I therefore, find and conclude:

(a) That the assets transferred by Old Spencer to New Spencer pursuant to the plan of reorganization were transferred solely in exchange for stock and securities; [10]

(b) That none of the consideration received by Old Spencer as a part of the reorganization in fact constituted "other property" within the meaning of the Internal Revenue Code; [11]

(c) That the value of all the consideration received by Old Spencer from New Spencer did not exceed the cost basis of the property transferred by Old Spencer to New Spencer as a part of the reorganization (see Findings 40–42); [11A]

(d) That plaintiffs have not proved that Old Spencer recognized gain on the transaction.

44. I, therefore, find that (1) the transactions herein detailed constituted a reorganization as defined in the Code, (2) involved a transfer of property by Old Spencer, a corporation, (3) solely in exchange for stock and securities of New Spencer, a corporation (4) pursuant to the plan of reorganization, and (5) both Old Spencer and New Spencer were parties to the reorganization.

## V.

## DOES THE STATUTE OF LIMITATIONS BAR THE REFUND CLAIM FOR 1952?

45. Old Spencer, in its federal income tax return for the fiscal year ended June 30, 1952, reported a gain of $165,808.03 realized by it on its sale of machinery and equipment for $381,112.83 to New Spencer on June 26, 1952 (Exs. W, W–1).

10. Contrary to the contention of the plaintiffs, the burden was not upon the government to show that the equipment note was not "other property." The Court of Appeals left this question open for further proof (364 F.2d at 536). The burden of proof was in fact upon plaintiffs.

11. The preferred stock and Class A common stock, of course, were clearly "securities". Court of Appeals, p. 535, and see discussion.

11A. The plaintiffs have failed to prove the value of the Class A common stock and the preferred stock received by Old Spencer.

46. In a consolidated federal income tax return for the fiscal year ended June 30, 1953, New Spencer deducted depreciation based on its cost of $381,112.83 of such machinery and equipment (Exs. C, C–1).[11B]

47. The Internal Revenue Service audited the aforementioned returns simultaneously. It disallowed depreciation deductions to New Spencer based on its machinery cost of $381,112.83 but did not eliminate the gain of $165,808.03 reported by Old Spencer. The two companies paid the deficiencies asserted against them.

48. On June 26, 1957, claims for refunds were filed by Old Spencer with respect to the 1951 and 1952 loss deduction disallowances and by both companies with respect to the 1953 depreciation deduction disallowance (Complaint, pars. 11, 23, 35; admitted, Answer, pars. 11, 23, 35). The claim for 1952 was rejected by letter dated December 31, 1957 (Complaint, par. 24; admitted, Answer, par. 24); apparently no further action by the Internal Revenue Service had been taken regarding the 1951 and 1953 claims.

49. On July 2, 1964, Old Spencer filed a claim for refund with the Internal Revenue Service for the 1952 capital gains tax "based on an inconsistent position of the Internal Revenue Service and based on a district court decision rendered April 16, 1964" (Ex. B–K). No evidence has been offered as to the disposition of this claim.

50. On the remand of this case from the Court of Appeals, the complaint was amended to assert this claim for refund of the tax paid by Old Spencer on the machinery gain if, and only if, the gain is held on this remand to be a nontaxable transfer. The government has amended its answer to allege a defense to this alternative claim of statute of limitations.

51. The claim by Old Spencer for refund of the capital gains tax paid on the alleged gain from the sale of equipment and machinery to New Spencer in June 1952 is barred by the statute of limitations (see discussion).

## DISCUSSION

### I.

### PLAN OF REORGANIZATION

■ The separate steps through to January 8, 1953 must be treated as a unit. *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179, 184–185, 62 S.Ct. 540, 86 L.Ed. 775 (1942).

Old Spencer and New Spencer were clearly parties to a reorganization. Old Spencer owned more than 80% of the stock of New Spencer at the time of the consummation and had control as required under the statutes. As elsewhere delineated, this transfer of the equipment of Old Spencer was a step in the integrated transaction constituting a reorganization. The intent of the parties was clear. The parties both intended that New Spencer would take over the entire business of Old Spencer. The timing and the interdependence were also consistent with the reorganization.

■ The transfer of the machinery and equipment was a crucial part of the step transaction consisting, among other things, of the changing of the name of the old company, the organization of the new company with the old company's previous name, the transfer of the construction business, the issuance of stock of New Spencer, the receipt of cash by New Spencer in order to operate and with which to purchase the equipment. Old Spencer actually made no profit by this transaction; it was a transitory arrangement which was followed by the ultimate acts of consummation, including issuance of preferred stock. It is clear that the plaintiffs have failed to prove that the transfer of the machinery, equipment and other assets was not an integral part of a non-taxable step transaction under Section 112 (b) (4).

---

11B. Old Spencer used these capital gains to offset losses in the River Construction Corporation. See my original opinion herein.

■ "The plan [of reorganization] need not take any particular form and not possess any special formality; it need not be reduced to writing; and it may be amended as circumstances dictate." 3 Mertens, Law of Federal Income Taxation § 20.64, at 258 and cases cited in note 98 (1965).

■ The conditions to be satisfied before recognition of a gain or loss may be postponed under Internal Revenue Code § 112(b) (4) are: (1) a reorganization as defined in the Code and (2) a transfer of property by the corporation (3) in exchange for stock and/or securities (4) pursuant to the plan of reorganization, (5) both the transferor and the corporation whose stock or securities are exchanged being parties to the reorganization. See 3 Mertens, supra, § 20.73, at 295 and cases cited therein; see also § 20.64, at 246–47 and cases cited therein. I have found that all are present here. See Finding 44.

## II.

### THE DRILLED-IN-CAISSON CORP. STOCK

No discussion of this factual question is necessary. The findings demonstrate that this transaction was not a part of the plan of reorganization.

## III.

### TRANSFER OF GOODWILL OR CORPORATE NAME OF OLD SPENCER

■ Again, this is a factual question. As repeatedly stated by the courts, tax matters are viewed by realities rather than by formalities.

## IV.

### TAX EFFECT OF REORGANIZATION

The Court of Appeals, after noting that the government urged affirmance on the ground that the taxpayers had not sustained their burden of showing that Old Spencer in fact incurred a taxable gain on the transfer of its machinery, wrote:

" * * * In theory the government's argument is of course sound because taxpayers must establish both the existence of boot to enable recognition, and the fact of gain on the transfer, before a stepped-up basis is permitted under Sections 113(a) (7) and (a) (8). * * * " 364 F.2d at 536.

■ The principal legal question with respect to the reorganization is whether it was tax free, as the government claims, or taxable, as plaintiffs contend. The transaction between Old Spencer and New Spencer may be considered, in the first instance, at least, as either a reorganization under Section 112(b) (4) or as a reorganization under Section 112 (b) (5) of the Internal Revenue Code of 1939. The burden is on the plaintiffs to establish that Sections 112(b) (4) and 112(b) (5) do not apply and that the reorganization transactions, as limited herein, constituted a taxable event in which gain is recognized under the Code.

As delineated by the Court of Appeals:

" * * * To qualify as a 'D' reorganization, Old Spencer 'or its shareholders or both' must be in 'control' of New Spencer 'immediately after the transfer.' Control is defined in Section 112(h) as the possession of 'at least 80 per centum of the total combined voting power of all classes of stock entitled to vote.'" 364 F.2d at 537.

As a result of the stipulation of the parties to the effect that Old Spencer was in control of New Spencer until the plan of reorganization was consummated (see p. 2 of Pretrial Order, March 3, 1967) and substantiated by the facts in respect to stock control (see Findings 14 and 39), the transaction may be considered as a reorganization under Section 112(b) (4) and, specifically, as a "D" reorganization. The criteria set forth in Section 112(g) (1) (D) involves transactions which have constituted

"(D) A transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its share-

holders or both are in control of the corporation to which the assets are transferred * * *."

As a result of findings I have made, the relevant section is 112(b) (4), which provides as follows:

"No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."

(See Findings 12, 15, 38, 43, 44).

Examination of the structural substance of the reorganization transactions clearly establishes that the note was designed as a means of providing capital for New Spencer. See, e. g., Burr Oaks Corp., 43 T.C. 635 (1965), aff'd, 365 F.2d 24 (7th Cir. 1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967); Reef Corp., 24 CCH Tax Ct. Mem. 1965–72, aff'd, 368 F.2d 125 (5th Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454 (U.S.Apr. 25, 1967); Gooding Amusement Co., 23 T.C. 408, 423 (1954), aff'd, 236 F.2d 159 (6th Cir. 1956), cert. denied, 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957). See also John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

"Generally speaking, the term 'stock or securities' probably includes any obligation of a corporation which is bought, sold, or exchanged and otherwise traded in as such by 'investors.' " 3 Mertens, supra, § 20.67, at 278–79. See also Carlberg v. United States, 281 F.2d 507 (8th Cir. 1960). The issuance of the preferred stock was clearly within the above term of "stock or securities." The plan from the start clearly contemplated the issuance of 35,000 shares of preferred stock for $350,000. The practical result was to transfer Old Spencer's construction business to New Spencer with all assets, including plant, machinery, furniture and fixtures, prepaid insurance premiums, name, goodwill and incomplete contracts. The tests of whether the steps or series of steps were to be treated as one single transaction, as set forth in American Bantam Car Co., 11 T.C. 397 at 405 (1948), aff'd per cur., 177 F.2d 513 (3rd Cir. 1949), cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950), were fulfilled.

The ultimate transformation of the equipment note into preferred stock is substantial indication that the note was "security." The Court of Appeals wrote:

" * * * If this stock issuance was in substance a part of the redemption of the promissory note, than the question of whether the note was a security may take on a new light. [footnote omitted] Under these circumstances, in remanding this part of the case, we do not foreclose further consideration of this issue." 364 F.2d at 536.

There was no gain properly recognized or realized by Old Spencer and its concomitant step-up is not properly allocated to New Spencer's basis. See Court of Appeals, opinion, ibid.

The net cash in the transaction went to New Spencer, not to Old Spencer (see Finding 42). Substance, reality and total effect, rather than mere form, govern. Dixon v. United States, 224 F.Supp. 358, 364 (S.D.N.Y.1963), aff'd, 333 F.2d 1016 (2nd Cir. 1964), aff'd, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965). Artifice should not be exalted over reality. Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935). "A given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938). "It is the situation at the beginning and end of the reorganization at which we must look." Republic Steel Corp. v. United States, 40 F.Supp. 1017, 1023, 94 Ct.Cl. 476 (1941).

Old Spencer not being entitled to recognize gain on the transaction since none existed, New Spencer is not entitled under Section 113(a) (7) to any step-up in basis on which to predicate later de-

preciation on any assets received from Old Spencer.

## V.

## THE DEFENSE OF THE STATUTE OF LIMITATIONS

Old Spencer requests this court to allow it at least a refund of the 1952 tax paid on the declared gain from the purported (putative) sale of machinery and equipment.

## THE BASIC REQUIREMENTS FOR A REFUND CLAIM

 The Internal Revenue Code requires that a claim for a refund be filed with the Internal Revenue Service in accordance with Treasury Regulations as prerequisite to suit for recovery of taxes paid. 26 U.S.C. § 7422(a). Such a claim must be filed within three years from the filing of the tax return in question or two years from the payment of the tax. 26 U.S.C. § 6511(a). The regulations prescribe the form for the claim and require that the claim state specifically the grounds and the facts upon which it is based. Treas.Reg. § 301.-6402–2(b) (1). In the absence of a waiver by the government, no suit may be maintained upon grounds not presented to the Commissioner in a timely claim or by a proper amendment to a timely claim. Weagant v. Bowers, 57 F.2d 679, 680 (2nd Cir. 1932).

## THE CLAIM FILED ON JULY 2, 1964

 It is obvious that the claim filed with the Internal Revenue Service on July 2, 1964 cannot be treated as an amendment to the original refund claim for 1952 since that claim was rejected by the Commissioner on December 31, 1957, hence was no longer pending and, consequently, could not be amended. Tobin v. Tomlinson, 310 F.2d 648, 652 (5th Cir. 1962), cert. denied 375 U.S. 929, 84 S.Ct. 327, 11 L.Ed.2d 262 (1963); Pink v. United States, 105 F.2d 183, 186–187 (2nd Cir. 1939). Even if the 1964 claim had been filed before rejection of

the original claim for 1952, it was not sufficiently related to the grounds of the earlier claim to relate back to the time of filing of that claim for statute of limitations purposes. See United States v. Henry Prentiss & Co., 288 U.S. 73, 53 S.Ct. 283, 77 L.Ed. 626 (1933).

## WAIVER

 Old Spencer claims that the government has waived the formal requirements of a claim as to the 1952 capital gains tax by putting the taxability of the transfer into issue in relation to the 1953 depreciation deduction claim, under the doctrine of Tucker v. Alexander, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927). However, neither the Tucker case nor the cases following its doctrine support Old Spencer's position here. In those cases the Commissioner investigated a ground for refund on behalf of a taxpayer with a view toward making a refund on that ground, despite the fact that the formal claim filed was too vague or specified another ground and that he was not required to proceed in that manner.

In this case, although the taxability of the 1952 transfer of equipment and machinery was in fact investigated, it was solely for the purpose of determining the basis for depreciation of that machinery in 1953, not to determine whether a refund should be granted for 1952. Evidence at the trial was introduced only for the same purpose. There is no indication that the taxpayer ever called to the attention of the government, before the initiation of this suit, that a finding of non-taxability would be a ground for refund of part of the 1952 tax, nor was any demand, express or implied, made for such a refund, as such alternative grounds were raised in cases where waiver has been found. In the complete absence of such a demand, the Commissioner had no opportunity or obligation to reject it or to require a formal claim to be filed within the applicable period of limitations, and thus no waiver of a right to require such a claim can be lodged against the Commissioner.

## ARGUMENT OF STRIC-TISSIMI JURIS

Old Spencer also claims that its original claims were sufficient to raise the issue before the Commissioner and that the issue is now properly before the court. Old Spencer thus correctly states that claims for refunds are not to be construed strictissimi juris. National Forge & Ordnance Co. v. United States, 151 F.Supp. 937, 941, 139 Ct.Cl. 204 (1957). However, it would take a broad interpretation to bring the new issue under the canopy of the original 1952 claim.

Nevertheless, although pleaded as an amendment to the second count of its complaint, the new claim is closely related to the third count and presents some peculiar features.

(1) The new claim relates to a tax paid for 1952, while the third count involves a tax payable for 1953.

(2) The new claim relates to a tax paid by Old Spencer, while the claim set forth in the third count is allocable to New Spencer. Old Spencer, however, is a party to the cause of action set forth in the third count. Furthermore, the tax laws recognize a close relationship between the two corporations in allowing their consolidated return for 1953, Internal Revenue Code of 1939, § 141; Code of 1954, §§ 1501–1504; see also Code of 1939, § 141 (h); Code of 1954, § 6503(a) (2), and the same relationship is in part the basis for the non-taxability of the transfer in issue. Code of 1939, § 112(b), (g), (h); Code of 1954, §§ 351, 368(c). Under some circumstances it may also play a part in the application of the statutory mitigation provisions. Code of 1954, § 1313(c) (7). Cf. Code of 1939, § 3801 (b) (5).

(3) The factual issues involved in the new claim and in the third count are substantially the same. The only facts not necessarily included in the evidence regarding the third count are that Old Spencer reported the gain and paid the tax on it, and it is difficult to believe that the government would have investi-

gated the claim made in the third count without ascertaining those facts. In fact, to quote the government's post trial memorandum, "it is true that Old Spencer should not have paid tax in 1952 with respect to its transfer of machinery and equipment to New Spencer" (p. 39). This statement may be somewhat presumptive, but it reveals that there is no problem of surprise or of stale evidence.

(4) The government itself, not the taxpayer, has contended that the transfer in issue was tax free. This has been the crucial point of the government's position since the refund claim for 1953 was first filed. The taxpayer has always contended that the transfer was taxable and asserts its non-taxability now only as an alternative ground for recovery.

There is no case directly in point on these facts. Certainly this is not a mere case of confusion of names on a refund claim, as was Thompson v. United States, 332 F.2d 657 (5th Cir. 1964), upon which Old Spencer places much reliance.

Cases cited by Old Spencer indicate that waiver or the propriety of amendment of a claim for refund, while before the Commissioner, turn chiefly on whether or not he was appraised of the factual basis of the claim and had an opportunity to investigate the facts. A mere change in legal theory would be insufficient to defeat a claim whose factual basis was properly presented. Bemis Bro. Bag Co. v. United States, 289 U.S. 28, 53 S.Ct. 454, 77 L.Ed. 1011 1933); Pink v. United States, 105 F.2d 183, 186–187 (2nd Cir. 1939). Likewise, in holding that the statute of limitations has no direct effect upon the pleading of a proper defense of recoupment, in tax cases and in other civil cases, the Supreme Court has stressed the identity of the factual issues involved in the main claim and in the defense. United States v. Western Pac. R.R., 352 U.S. 59, 70–74, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Bull v. United States, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); Luckenbach S.S. Co. v. United States, 312 F.2d 545, 549 n. 3 (2nd Cir. 1963).

While such cases may be used by analogy to determine whether a judicial action for a tax refund rests upon the same ground as the claim before the Commissioner, there is a major distinction between this case and the waiver and amendment cases referred to. In this case the new ground and the original ground involve taxes paid in different years. Each year's tax is a separate item, and a claim or demand for one does not toll the statute of limitations for another, even with regard to a tax arising from the same transaction. See McEachern v. Rose, 302 U.S. 56, 58 S.Ct. 84, 82 L.Ed. 46 (1937). Compare Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932). Consolidated Coppermines Corp. v. United States, 296 F.2d 743, 15 Ct.Cl. 731 (1962) and National Forge & Ordnance Co. v. United States, 151 F.Supp. 937, 139 Ct.Cl. 204 (1957), involved claims for net operating loss carryback and carryover deductions, which necessarily and ipso facto put in issue the tax liability of another year. The claims here are as separate as those of the corporate taxpayer and its individual owner were in Hindes v. United States, 371 F.2d 650 (5th Cir.), cert. denied, 386 U.S. 992, 87 S.Ct. 1307, 18 L.Ed.2d 337 (1967).[12]

### STATUTORY MITIGATION PROVISIONS

The Court of Appeals, in its opinion remanding this case, suggested that this case might fall within the mitigation provisions of the Internal Revenue Code, 364 F.2d at 538. Under Section 1315, the case would appear to be governed by the provisions of the Code of 1954.

The burden is on the taxpayer to show that it comes within the mitigation provisions. United States v. Rushlight, 291 F.2d 508, 514 (9th Cir. 1961).

Any refund under the mitigation provisions, however, would be premature in this action. There has not yet been a final determination regarding the taxability of the transfer as required by Sections 1311 and 1313(a) of the Internal Revenue Code of 1954. Benenson v. United States, 257 F.Supp. 101, 110–11 S.D.N.Y.1966), and cases cited therein.

The claim for a refund of the tax paid on the 1952 exchange of property and securities between Old Spencer and New Spencer was not raised before the Commissioner in the claims alleged as the bases of this suit. The Commissioner did not waive the requirement of a formal claim, and any new claim is barred by the statute of limitations. Since the Code and the regulations thereunder require a timely claim to be filed with the Commissioner as a condition precedent to a suit for refund of a tax, the court has no jurisdiction in this action to grant relief with respect to that item. This is not intended to imply any decision as to the merits of any claim which may be filed hereafter based on any statutory mitigation provisions.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by virtue of Title 28 U.S.C. § 1346(a) (1).

2. The taxpayers have the burden of proving that the transactions between June 18, 1952 and January 8, 1953, involving the transfer of the construction business of Old Spencer to New Spencer, were taxable.

3. All the various arrangements entered into by Old Spencer and New Spencer were steps in a single transaction whereby Old Spencer exchanged machinery, equipment and other property necessary for its construction business,

12. The doctrine of equitable recoupment was not raised by counsel. I have considered it, but it seems inapplicable to this case. The transfer and the subsequent claim of depreciation are two "taxable events." Wood v. United States, 213 F.2d 660 (2nd Cir. 1954). But see Gooch Milling & Elevator Co. v. Commissioner, 133 F.2d 131, 134–135 (8th Cir.), rev'd on other grounds, 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139 (1943); Crossett Lumber Co. v. United States, 87 F.2d 930, 109 A.L.R. 1348 (8th Cir. 1937). Old Spencer should have filed an alternative protective claim. See Kellogg-Citizens Nat'l Bank of Green Bay, Wis. v. United States, 330 F.2d 635, 165 Ct.Cl. 452 (1964). This it failed to do.

including the name and goodwill but not including 250 shares of Drilled-In-Caisson Corp. to New Spencer, which was organized to take over Old Spencer's business, in return for its stock. American Bantam Car Co., 11 T.C. 397 (1948).

4. The transfer of the machinery and equipment to New Spencer was not a sale but part of a non-taxable exchange within the meaning of Section 112(b) (4) of the Internal Revenue Code of 1939.

5. As such, the so-called machinery note was but a transitory phase of the arrangement, an intermediate procedural device, which hence may be entirely disregarded. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942).

6. The so-called note was not in reality debt, but equity. Gilbert v. Commissioner, 262 F.2d 512 (2nd Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); Burr Oaks Corp., 43 T.C. 635 (1965), aff'd, 365 F.2d 24 (7th Cir., 1966), cert. denied, 385 U.S. 1007 (1967); Gooding Amusement Co., 23 T.C. 408 (1954), aff'd 236 F.2d 159 (6th Cir. 1956), cert. denied, 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957).

7. The transactions as hereinbefore specified constituted a reorganization as defined in the Code, involved a transfer of property by Old Spencer, a corporation, solely in exchange for stock or securities of New Spencer, a corporation, pursuant to the plan of reorganization, and both Old Spencer and New Spencer were parties to the reorganization.

8. Plaintiffs have not proved that Old Spencer recognized or realized gain on the transaction.

9. New Spencer is not entitled to the stepped-up basis. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540 (1942); Survaunt v. Commissioner, 162 F.2d 753 (8th Cir. 1947); Portland Oil Co. v. Commissioner, 109 F.2d 479 (1st Cir.), cert. denied, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940).

10. Old Spencer is not entitled to recover in this action a refund of the tax erroneously paid by it on the alleged gain from the putative sale of machinery and equipment to New Spencer. United States v. Felt & Tarrant Manufacturing Co., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931).

The defendant is entitled to judgment dismissing the complaint with costs.

Settle judgment on notice.